**SO ORDERED.**

**SIGNED this 06 day of August, 2008.**

_____
**A. Thomas Small**
**United States Bankruptcy Judge**

_____

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**RALEIGH DIVISION**

| | |
|---|---|
| **IN RE:** | **CASE NO.** |
| **STEVEN D. KLINGERMAN** | **07-02455-5-ATS** |
| **DEBTOR** | |

**ORDER REGARDING CONFIRMATION OF PLAN**

A hearing to consider confirmation of the plan of reorganization filed by the chapter 11 debtor, Steven D. Klingerman, was held in Raleigh, North Carolina on July 29, 2008. An objection was filed by Bradley E. Parker, as an individual and as a member/manager of ExecuCorp, LLC.

The viability of the debtor's plan, which proposes to pay creditors in full plus interest, depends on whether the debtor can force the dissolution of ExecuCorp LLC and the sale of its sole asset, a building in downtown Raleigh, North Carolina. Mr. Klingerman and Mr. Parker each own a 50% interest in ExecuCorp, and the debtor contends that ExecuCorp should be dissolved pursuant to North Carolina General Statute § 57C-6-02 because the two owners are irreconcilably deadlocked and the affairs of the ExecuCorp can no longer be conducted to the general advantage of both members. The debtor brought an adversary proceeding to dissolve ExecuCorp, but that adversary proceeding is currently stayed pending Mr. Parker's motion to the district court for leave to appeal this court's order denying his motion for summary judgment. However, notwithstanding the stay,

the court heard testimony from both Mr. Klingerman and Mr. Parker to ascertain the debtor's prospects for accomplishing a dissolution of ExecuCorp. After considering the evidence, the court finds that it is more likely than not that the debtor will prevail after a trial on the merits in the adversary proceeding. However, for several reasons that will be explained later in this opinion, the court will defer its decision regarding confirmation.

Mr. Klingerman filed his petition for relief under chapter 11 of the Bankruptcy Code on October 30, 2007. Apparently, the bankruptcy was precipitated by a lawsuit brought by the debtor's former spouse, Laura Klingerman, to force the sale of ExecuCorp to satisfy the debtor's obligation to her under a marital property settlement.

The largest debts listed in the debtor's schedules are disputed obligations to (1) Laura Klingerman, in connection with the property settlement, (2) Countrywide Home Loans arising from investment properties that the debtor no longer owns, (3) First Citizens Bank in connection with the mortgage on real property owned by ExecuCorp, and (4) Brad Parker for sums owed in connection with expenses of ExecuCorp. Proofs of claims were filed by (1) Mrs. Klingerman for $75,000, (2) First Citizens Bank for $199,000, and (3) Mr. Parker for $22,000 plus attorney's fees; Countrywide did not file a proof of claim. Additionally, there is an Internal Revenue Service priority claim for $6,210 and an IRS unsecured claim for $2,295, and there are unsecured credit card claims of approximately $4,700.

The debtor owns no real property, and his most valuable asset is his ownership interest in ExecuCorp, which he contends is worth approximately $390,000. His other significant assets include business furniture worth $25,000 and a $15,000 motorcycle. The debtor's statement of affairs and the disclosure statement reflect that in June 2006, the debtor gave $100,000 to his new

spouse, Nancy Klingerman, but he does not intend to bring an adversary proceeding to avoid that transfer. The debtor lives in Oregon and is starting a construction business, but he does not plan on using the assets or the income from that business to fund his plan.

The debtor filed his plan and disclosure statement on January 28, 2008, and as is the practice of this court in cases of this size, the disclosure statement was conditionally approved.[1] Mr. Parker filed objections to both the disclosure statement and to confirmation of the plan. The debtor filed an adversary proceeding on February 11, 2008, seeking a dissolution of ExecuCorp. Mr. Parker filed a motion for summary judgment on the grounds that Mr. Klingerman ceased to be a member of ExecuCorp when he filed his bankruptcy petition and thus he did not have standing to force the dissolution of the limited liability company. The court denied the motion for summary judgment and Mr. Parker filed a motion for leave to appeal. The court allowed Mr. Parker's motion for a stay pending a determination by the district court of the motion for leave to appeal, but did not stay the combined hearing to consider final approval of the disclosure statement and confirmation of the plan.[2]

The debtor's plan depends on the debtor's prevailing in the adversary proceeding and the dissolution of ExecuCorp. The debtor maintains that dissolution should be required pursuant to North Carolina General Statute § 57C-6-02, which provides that

> The superior court may dissolve a limited liability company in a proceeding by the following:
>
> * * *

---

[1] The debtor is not a small business debtor as defined in 11 U.S.C. § 101(51D), and this is not a small business case as defined in § 101(51C).

[2] The combined hearing had been continued on several occasions because of discovery disputes and the pending motion for summary judgment.

> (2) A member if it is established that (i) the managers, directors, or any other persons in control of the limited liability company are deadlocked in the management of the affairs of the limited liability company, the members are unable to break the deadlock, and irreparable injury to the limited liability company is threatened or being suffered, or the business and affairs of the limited liability company can no longer be conducted to the advantage of the members generally, because of the deadlock, (ii) liquidation is reasonably necessary for the protection of the rights or interests of the complaining member, (iii) the assets of the limited liability company are being misapplied or wasted; or (iv) the articles of organization or a written operating agreement entitles the complaining member to dissolution of the limited liability company [.]
>
> * * *

N.C. Gen. Stat. § 57C-6-02(2). According to Mr. Klingerman, he and Mr. Parker are deadlocked with respect to the future of ExecuCorp, and the result of the deadlock is that the LLC is not being operated to the members' advantage, and is specifically being operated to the disadvantage of the debtor.

ExecuCorp is a North Carolina limited liability company that essentially has one asset, a unique building in downtown Raleigh, North Carolina. The building has two levels, a street level with large garage doors, and a basement. In 1997, Mr. Parker was interested in buying the building for use in his limousine business and asked his good friend Mr. Klingerman, who was in the construction business, to take a look at the building. Mr. Klingerman apparently liked what he saw and proposed that he and Mr. Parker buy the building together. It was Mr. Klingerman's idea that Mr. Parker could use the first floor and the debtor could use the basement for his construction/remodeling business. The Klingerman/Parker partnership took the form of a limited liability company under the North Carolina Limited Liability Company Act. The limited liability company was named ExecuCorp LLC, and that entity purchased the building.

ExecuCorp's articles of organization were filed with the North Carolina Secretary of State on September 11, 1997, and provided that "all of the members by virtue of their status as members

shall be managers of this limited liability company." (Ex. 1, Articles of Organization). Mr. Parker and Mr. Klingerman were the two organizers of ExecuCorp, and they were the member-managers. Mr. Klingerman and Mr. Parker also executed an Operating Agreement for ExecuCorp. (Ex. 2). The Operating Agreement is 25 pages long, but contains mostly boilerplate provisions that do not address the problems that arise when the two equal managers have a falling out and cannot agree on how to run the corporation. Although the essence of the arrangement between the two is that Mr. Klingerman would have the use of the basement and Mr. Parker would have the use of the first floor, there is no written agreement that memorializes that understanding. The terms and conditions of occupancy were not reduced to writing and no written agreement spells out what happens if a member does not pay his share of the expenses.

The parties also did not appear to observe any of the corporate formalities, and in some instances ignored basic corporate requirements. For example, Mr. Parker maintained a bank account in ExecuCorp's name, but considered the funds in the account to be his funds and treated the account as his personal checking account. At one point Mr. Klingerman tried to sell the basement space, which, of course, could only be sold by the owner of the building, ExecuCorp.[3]

For the first few years the lack of written leases and the absence of corporate observances did not seem to matter as long as Mr. Klingerman and Mr. Parker were friends. Each owner occupied his respective floor of the building and paid his equal share of the expenses. In 2002, Mr. Klingerman, who was having both financial and marital problems, vacated his part of the building and moved to Oregon. Nevertheless, he continued to pay his part of the ExecuCorp expenses.

---

[3] It is doubtful that even ExecuCorp could sell a portion of the building without a condominium or similar regime that allows unit ownership within a single structure.

Sometimes the payments were very late, but he was current with his obligations until Mr. Parker advised him of his position that if the building was ever sold, Mr. Klingerman would be entitled to only a third of the proceeds. Mr. Parker based that assessment on the fact that the value of Mr. Klingerman's portion of the building was only worth a third of the total. However, there is nothing in the Articles of Organization or the Operating Agreement that would support anything other than a 50-50 allocation. The Operating Agreement clearly provides that Mr. Klingerman's ownership interest, as stated in Schedule A of the Operating Agreement, shall be 50%. (Ex. 2, p. 3). Other provisions of the Operating Agreement also corroborate Mr. Klingerman's 50% ownership interest. See Ex. 2, Operating Agreement, §§ 7.06 (p. 11), 9.03 (p. 14), 9.04 (p. 15), 10.01 (p. 15), and 13.03(b)(4) (p. 20). The equal ownership of Mr. Klingerman and Mr. Parker is also reflected in ExecuCorp's tax returns for years 1997 through 2006. (Exs. 5 to 14). For purposes of § 57C-6-02(2), this dispute regarding Mr. Klingerman's ownership constitutes a deadlock in management.

Although the disagreement over Mr. Klingerman's ownership interest appears to be the primary source of the deadlock, there are others as well. The Operating Agreement gives each member an equal say in how the limited liability corporation should be run. Section 5.01 of the Operating Agreement provides that "[t]he business and affairs of the Company shall be managed by its Managers." (Ex. 2, p. 6). Section 5.04(g) provides that it takes the written approval of two members to execute documents including checks and drafts. (Ex. 2, p. 7). The Operating Agreement requires both parties to agree with respect to a sale of the property, and that presents a problem for Mr. Klingerman because he wants to sell the property and Mr. Parker does not. See Operating Agreement § 504(f) (two members approval needed to dispose of substantially all assets) and §7.05 (51% vote needed to sell substantially all of assets) (Ex. 2, pp. 7, 11).

Mr. Klingerman would like to sell his interest in ExecuCorp, but even that, pursuant to §12.02 of the Operating Agreement, requires Mr. Parker's consent. (Ex. 2, pp. 17-18). Another source of disagreement is Mr. Parker's imposition of a $500 monthly management fee. It is true that Mr. Klingerman vacated the building and left the management to Mr. Parker, but the arbitrary $500 fee seems excessive. Furthermore, Mr. Parker has precluded Mr. Klingerman from having unsupervised access to the building.

The court's findings and conclusions are supported by the scant North Carolina case law on the subject. Ellis v. Civic Improvement, Inc., 24 N.C. App. 42, 209 S.E. 2d 873 (1974) (dissolution of a corporation that had one asset, an office building, was warranted because of a voting deadlock between the two doctors who were the corporation's sole owners).

A finding that there is a deadlock that is detrimental to the business, however, does not mean that the court will necessarily order the limited liability corporation to be dissolved. "[W]hether to grant dissolution is within the trial court's discretion even though grounds for dissolution are found to exist under the statute." Foster v. Foster Farms, Inc., 112 N.C. App. 700, 760, 436 S.E. 2d 843, 847 (1993). In a proceeding to dissolve a limited liability corporation, the court has broad authority to "take other action required to preserve the assets of the limited liability company, wherever located, and carry on the business of the limited liability company." N.C. Gen. Stat. § 57C-6-02.1(c). Pursuant to this authority, the court could revise the terms of the Operating Agreement to address those issues that should have been addressed when ExecuCorp was formed. Judicial intervention in the affairs of the corporation, however, should be a last resort, and it would be preferable if Mr. Klingerman and Mr. Parker could set their personal animosity aside and resolve their differences themselves.

The court will defer its decision for thirty days to give the parties time to try to come to an agreement. A formal mediation will not be required, but the court's mediation procedures are available if the parties believe that a formal mediation would be helpful.

The court finds that the disclosure statement contains adequate information as that term is defined in § 1125(a) and the disclosure statement is **APPROVED**. If an agreement is not reached between Mr. Klingerman and Mr. Parker with 30 days (or at such earlier time as the parties notify the court that an agreement cannot be reached), the court will rule on whether to confirm the debtor's plan. In reaching that decision, the court will consider whether in the adversary proceeding it would be likely to exercise its discretion to dissolve ExecuCorp pursuant to North Carolina General Statute § 57C-6-02, to exercise its broad authority under North Carolina General Statute § 57C-6-02.1 to modify the terms of the operating agreement, or to leave things as they are.

**SO ORDERED**.

**END OF DOCUMENT**